Good morning, Your Honors. I'm Will Patton for the City of Seattle, and I'd like to reserve three to five minutes for rebuttal. This case really involves the question of whether a company, that is the Olympic Pipeline Company, can promise through contracts with at least two cities in the state of Washington, the City of Seattle and the City of Bellingham, to do certain things that involve a modicum of safety oversight by both cities. And then later, when one of those cities or both of them ask that those contractual terms be enforced, say, I'm sorry, we can't do that because our ability to agree with you to do anything involving safety of a hazardous liquid pipeline is preempted by federal law. Our position is that the Olympic Pipeline, both when it entered into the franchise agreement and the indemnity agreement with the City of Seattle on November 3, 1992, and when it entered into the agreements with the City of Bellingham in 2000 after the fire that killed three people in Bellingham in 2000, in 1999, waived any argument that it may have had before that, that its agreements were preempted by federal law. This Court in Leonard v. Clark, involving a union agreement where the union had waived its First Amendment rights to petition the legislature, said that if the union had believed that it was that federal law preempted the request of Clark to insist on those conditions, it should have said so at the time and not have signed the agreement and wait until later when the other side of the country is, in the union case, the union is waiving its rights. In a preemption matter, you're dealing with the federal power. I understand that. They can't go ahead and waive federal power, federal law. Certainly, they cannot waive the federal power to insist through the Office of Pipeline Safety or by delegation to the Washington Utilities and Transportation Commission, cannot waive the requirement to abide by those safety requirements imposed by the federal government. But the federal statute in the Hazardous Liquid Pipeline Safety Act does not, as the pipeline amicus brief states, set uniform standards throughout the United States. It sets minimum standards throughout the United States so that a company can, and that's 49 U.S.C. 60102, and it states that it provides for minimum standards, so that a company can do more than is required by the Office of Pipeline Safety or by a state-delegated overseer, such as the Washington Utilities and Transportation Commission. It's not that the pipeline company cannot deviate whatsoever from federal standards. My difficulty, though, is that there's an express preemption clause, provision, section, whatever you want to call it, in the federal law, and it states what kinds of state authorities are allowed to adopt more strict standards. In other words, federal law contemplates exactly what you're saying, but it has some requirements for the state or local authority to follow before it can enforce those. And as I understand the argument of opposing counsel, it is that Seattle did not jump through those hoops that would permit it under the federal law to impose the more stringent standards. What is your response to that argument? My response is that there are two different situations here, and if one can imagine the Olympic pipeline running from the main interstate line that goes through Renton, Washington, and then the Seattle lateral goes from Renton to Harbor Island in the city of Seattle, if that pipeline went along the Burlington Northern or UP rail line and didn't use any Seattle property along the way, then that argument would prevail. That is, the city of Seattle couldn't impose safety requirements over a pipeline just because it was in the geographic boundaries of the city of Seattle. But here, as in Bellingham, the pipeline crosses through city property, and the contract is for the use of that city property. So these are not generally applicable standards that the city has insisted on in its contracts. These are contractual agreements with the pipeline for the privilege of using the city's property. So your position, as I take it, would be the same if you were a private landowner, just a rich person who owned a whole bunch of land and the pipeline went through it, and you could make whatever rules you wanted for them to use your land and come over it. Is that essentially your argument? Yes, that is. If Olympic Pipeline argued at the trial court that it had a condemnation authority over property, which under Washington law it does but not over public property in Washington, so if instead of condemning the property, it had agreed with a private landowner that it would agree to these conditions in order to get a 10-year easement over that private piece of property, our position would be the same. But yes, Olympic Pipeline has agreed with Mr. Gates that to cross his property, they will do this and that. And therefore ñ Just to mention a handy rich person like this. Yes, a handy rich person who happens to live around here. But if they, instead of condemning the property and then requiring the easement, if they had agreed to certain conditions, yes, they are contractually bounded by those conditions, so long as the imposition of those conditions by the landowner through the contract did not conflict with Federal law. That is, if the City of Seattle said, ìYou donít have to do anything that the Office of Pipeline Safety wants you to do,î that would, of course, be a violation of the Federal preemption to set minimum standards. But what Seattle has asked here for a hydrostatic test of the pipeline, which we believe is an annual requirement in the indemnity agreement, which is part of the franchise agreement, is not in conflict with Federal law. It is a part of the regulations. Itís not required at the moment by the regulations because the pipeline, the Seattle Lateral, was built before 1985. But that doesnít mean that a hydrostatic test, as was conducted three times by Olympic Pipeline in the State of Washington since the Bellingham Fire, is not in conflict with Federal safety standards. Otherwise, the Office of Pipeline Safety never would have approved any of those three tests. And, in fact, each of those tests in Bellingham, Woodinville, and Renton, the tests resulted in a break in the pipeline. Let me ask you this. Now, the State of Washington has been certified by the Department of Transportation to regulate or have regulations involving interstate and intrastate pipelines, right? Yes. To carry both gas and hazardous liquids. Yes. Okay. Now, the city could have gone to the State and, what, gotten certification? The certification must come from the Federal Department of Transportation. Okay. They could have gone to the Federal Department of Transportation. But the city didnít do that. And then isnít there another route that you could take? Potentially, Your Honor. The city could also get permission from the State to oversee those regulations that are more stringent, donít interfere with the movement of the hazardous waste through that pipeline. The city could have had two ways to go. It could have gone to the DOT or to the State of Washington. Is that a hard thing to accomplish? I believe it may be. Did anybody think about that when they entered the franchise agreement? No, they did not, because in 1992, just after the amendments to the Pipeline Act were passed, the State Department of Utilities and Transportation Commission had not been certified as a regulator. That certification occurred after the fire in Bellingham in 1999 when there was enhanced concern about the safety of pipelines. And so in 1992, no, the City of Seattle could not have. Is there any reason why Seattle couldnít get permission from the State or the Department of Transportation now? The city cannot step over or just ignore, in terms of being a certified regulator of the pipeline, cannot ignore the Department of Transportation, because thatís where the certification comes from. To the State of Washington. But the city has to be directly certified by the Department of Transportation if itís to become an overall regulator of the pipeline in Seattle. What Seattle relies on, and with good reason, is the contractual agreement that Olympic entered into voluntarily. There was no expression that Olympic objected to the conditions that were in both the franchise agreement and the indemnity agreement. In fact, Mr. Talley, whoís the president of Olympic Pipeline sitting here, on December 3, 2003, said he would be happy to receive the same agreement again. And as you may recall from the record, although itís an extensive record, that is, there is an ability in the franchise agreement for Seattle unilaterally to extend it two and two more ten-year periods. So the issue here is, well, does Seattle have the power that it thought it had and the contractual agreement it thought it had when it entered into that agreement, one that Olympic still, at least as of December 3, 2003, didnít object to? All they object to, apparently, is that when Seattle wants to enforce any of those contractual provisions, it holds up the Federal law and says you canít do that. And itís done the same thing. It admitted before Judge Lasnik that it has done the same thing with the City of Bellingham on what is, without doubt, an interstate pipeline. Thereís an argument as to whether the one coming from Renton to Seattle is interstate or interstate. But if you take the much larger and more complete example of the agreement that Olympic voluntarily entered into with the City of Bellingham in 2000, it gave Bellingham all kinds of safety oversight rights by contract over the operation of that interstate pipeline in the City of Bellingham. And yet they have said before Judge Lasnik, well, we promised that, but we donít have to abide by it if we donít want to. Itís just out of our courtesy or perhaps our politics that we are going to do that in Bellingham, but when Seattle wants to enforce this contract, we donít have to. So Seattle is in the position of saying, well, should one enter any kind of contract with an entity like that that signs it promising anything to get the franchise, knowing full well later itís going to say, ìGoodbye. Go away.î And the contract provides, as does the contract in Bellingham, that at the expiration of the contract, the pipeline is agreed to leave and restore the streets to their original condition. Of course, they havenít done that. They still sit there. And so they havenít complied with that part of the contract either. So we are in the position of believing that the Olympic Pipeline Company waived its preemption rights. It signed this agreement after the amendments to the Hazardous Liquid Pipeline Act, even though they always believed that it was an interstate pipeline, which, of course, that preemption existed from 1979, and agreed with Seattle to do these things. Seattle has the continuing contractual right to extend this contract if it has the rights that it thought it had. So itís not as if we are required to negotiate a new contract. We have the right to extend this one, and we believe we have the rights provided in that contract. Thank you, and Iíve reserved it. Good morning, Your Honors. Iím Val Cholifson. I represent Olympic Pipeline. Mr. Patton has already introduced Mr. Bobby Talley, the president of Olympic, whoís also president of the court this morning. Did they shake hands before they came in here? Pardon me? Did they shake hands before they came in? They shook hands. We shook hands all around, Your Honor. Oh, good. All right. We leave it at the door. This case is, as the court senses, part of the fallout of the June 1999 tragedy in Bellingham when the Olympic Pipeline ruptured. People were killed. There was extensive environmental damage, extensive property damage, huge economic consequences to Olympic, to the city of Bellingham, Whatcom County, people in that part of the state. The fallout has been widespread and interesting in a number of ways. That incident sparked an acceleration of the process that resulted in the adoption of comprehensive new pipeline safety regulations only a little over a year later. Whatís wrong with the private property analogy insofar as the pipeline passes over property thatís owned by the city of Seattle? That is, as I take your argument, it is federal law governs. You canít conflict with it. But when you go over my property, I can also set non-conflicting higher standards to let you come over my property with your pipeline. That might be true if youíre talking about private property in a proprietary sort of a way, not talking about that kind of private property, Your Honor. Weíre talking about public property. But is Seattle acting in its roleóin entering into the agreement, was Seattle acting in its role as landowner? In other words, or was it acting in some other role? Itís absolutely acting in its role as a regulator, Your Honor. If the court looks back at the Golden State 1 taxicab franchise case decided by the Supreme Court, in that case, the court made expressly clear that when itís dealing with franchises, a municipality is dealing as a regulator and not as a market participant. I understand the theoretical difference. But when you look at the indemnity agreement itself under the recitals, it recites some part of both. It recites that the city is reissuing a permit, which is acting in the cityís capacity, but it also recites that there is a pipeline that goes under, across, and along streets belonging to the city. So thereís a little bit of ambiguity, I think. But those streets belong to the city in its capacity as a municipal government, not in its capacity as the renter of streets. And the building and construction trades case, I think, makes the distinction nicely, just as Blackman in that case, talking about NLRA regulation, said that, and I can actually quote, he said, ìWeíve consistently held that the NLRA was intended to supplant state labor regulation, not all legitimate state activity that affects labor.î Yes, but that doesnít preclude a governmental entity, for example, from entering into a collective bargaining agreement that pays much higher wages than the minimum wage. So thatís why itís important to me, to this one of the three of us anyway, to try to sort out in what capacity Seattle entered into this contractual relationship. Because if itís analogous to saying, ìThis is our collective bargaining agreement with you, and weíre going to pay you thus and such.î That is a binding agreement thatís not a regulation. Itís entered into in the capacity as employer, individual employer, single employer of the city workers. And so thatís why Iím trying to get your take on why it is that when they say, ìYou can come under our streets, but if you do, we want you to do these certain things for us.î You know, ìIf thereís a spill, you have to pick up the phone and call us, and we also want you to look at it once a week, and we also want you to do a pressure test once a year.î Why isnít that in their capacity as owner? I seem to be arguing myself in circles, Your Honor, and Iím not sure Iím going to succeed in getting out of that. I think that there are two things that need to be looked at. One is the fact that the city is entitled to a franchise agreement, and there is nothing in the record here before the court to support the argument that Olympic Pipeline is willy-nilly saying your franchise agreement is no good. What Olympic Pipeline is saying is that you cannot enforce the safety, Pipelineís safety element of the franchise agreement. Actually, itís the indemnity. I was asking about the indemnity agreement. Yeah, itís actually the indemnity agreement where the language is specific, and thatís in the little packet of materials that I have. Yeah, itís at page 19, I think, of the excerpt to it. Paragraph 7 of the indemnity agreement specifically. Yeah. And thatís the only specific language, and I believe really even onlyó Is it your position that that entire paragraph is not binding, including the calling up if thereís a, you know, within 24 hours to say if theó Iím not going to read the whole thing out loud, but is it your position that that entire paragraph is null and void? Anything that has to do with Pipeline safety, the management operation, maintenance of the Pipeline, is the exclusive prerogative of the federal and state regulators. So, yes, Your Honor, that would be our position. What if the city of Seattle would say, ìWell, we donít want your Pipeline here anymore. Take it out.î Well, Your Honor, that is an interesting hypothetical. And I donít know the answer to that. I do know that thatís not an issue before the Court. Ió There are a lot of things that are an issue that we ask questions of. Well, I donít know the answer to that, Your Honor. I can seeó The city owns the street.  The city owns the street. I can see public policy arguments that would mandate that the city give, for instance, reasonable time for the Pipeline to find an alternative location or an alternative route. I donít know the answer. All I know is that the reason that we filed this case was that the city of Seattle said, ìHydrotest or shut down.î And we didnít think they had the right to say that. Thatís the issue. Itís a narrow, narrow, narrow issue. Itís not an issue of what would happenó certainly not an issue of what would happen or what happened in Bellingham. Let me ask you a question. This is a practicaló How much extra money would it cost every year to do what the city wants, the Civic Pipeline? Your Honor, I canít tell you how much it would specifically cost. Well, you have to have some idea. I canít tell youó $10, $20, $30. I think it would cost more than $49.95. You have no idea? I have no specific idea, Your Honor. I do have a response to the question, and the response is that Seattle is one of approximately 30 governmental jurisdictions that this Pipeline flows through from the beginning to the end. And if Olympic was subject to safety regulation and extra safety regulations for each municipality and each other governmental entity that it flowed through and each chose to exercise it, the cost would be enormous and would probably make the Pipeline uneconomical in Washington. Let me ask a question. I have another question about paragraph 7. Iím trying to understand how it fits into youró because you said it just a second ago that your position is very narrow and that the only thing that youíre upset about is the city telling you to do this or shut it down. Thereís also, of course, the indemnification provision in paragraph 6, which is very, very broadly worded. What would your position be if the city did its own inspections under its right of entry under paragraph 10 and then sent you the bill? Is that permitted under this agreement? Is that binding on you? I havenít looked at that paragraph, Your Honor, and I donít have the agreement right in front of me. I thought generally about the indemnity subject this morning, and it seemed to me that, in general, the Pipeline would be obligated to indemnify the city for damages arising out of the Pipeline. I donít think that the indemnityó No, it saysó I donít think that the indemnityó It includes fees, litigation expenses, expenses costs, including any breach of the warranty agreementóor, excuse me, the indemnity agreement, which, of course, includes failing to do the testing that youíve agreed to. Itís sort of circulating. I donít think that the indemnity provision could be used to make an end run around the fact that Pipeline safety is preempted by the Federal Government. Well, but there are other avenues that the city of Seattle could move through. Right? There are other avenues, Your Honor. That the city could employ in order to impose regulations that are stricter than the Federal regulations, and work with the State of Washington and go to the Department of Transportation. The statute, Your Honor, and particularlyó the case that I handed up to the Court, 49 U.S.C. 60105, says that a State authority has the right to regulate intrastate pipelines independent of DOT regulations if the State authority is certified. And it has a proviso that says municipalities are included in that only to the extent that youíre talking about a gas pipeline. This is a hazardous liquid pipeline. So under that statute, the city of Seattle would not have the right to go to the Department of Transportation and get certified to be the regulator of this pipeline. What is the legal effect of any of paragraph 17 of the indemnity agreement, which contains your warranty that whoever signs was authorized and could bind the party that they represented? Again, Your Honor, I can only reiterate the preemption argument. That warranty is binding in all respects, not preempted by Federal law. Let me ask you this. How often does the Federal Government inspect that pipeline weíre talking about? The answer is kind of in layers, Your Honor. Historicallyó In what? Itís kind of in layers. Historically, for instance, before the June 1999 explosion in Bellingham, I think itís fair to say that if there was a record made of it, the record would be that it was a relatively laissez-faire regulation. Since 1999, the regulators have been in at least Olympicó but theyíve been in Olympicís face constantly. They donít actually inspect themselves as much as they require inspections by Olympic and audit Olympics inspections and audit Olympics procedures. Thatís the routine. The level of focus has been intense. Olympic, pipeline-wide, has inspected and with its ongoing maintenance program does inspect using the newer technology tools that have come online, for instance, since 1992. It inspects its line many times more frequently than most hazardous liquid pipeline companies in the country. And the level of Federal regulation is intense. Well, itís intense in the sense that youíve got a report. Is that it? Yes, Your Honor. Why is that intense? Why is that intense? Itís the number of reports, Your Honor. Also, as the record reflects, as part of the consent decree that resulted from Olympicís criminal charges that followed the 1999 explosion, Olympic has had to, at its expense, hire an independent contractor to monitor itself. So itís not only performing its own inspections and submitting it to the audits of the Office of Pipeline Safety, but itís being monitored on a regular basis by an independent contractor whoís ensuring that Olympic is, in fact, living up to the regulations and its undertakings. Yeah, well, you know, a lot of that stuff goes on, but who knows how well itís done. ThatísóI have no response to that, Your Honor, except to say that the new management, the new operator of the Olympic pipeline has a different philosophy, apparently, than the older one had. And I believe that Olympicís record since 1999 has been a good one. I ask, you know, just as a practical matter, I donítóI would think that Olympic, if they would welcome the assistance ofóor the oversight of the city of Seattle. Your Honor, the problem is how you define oversight and where you draw the line with the multiple jurisdictions that are involved. I can tell you that at the beginning of this lawsuit foró You invite them in. You say, ìLook, weíre going to conduct an inspection.î And you come. You watch. Hereís our records. You look at them. If you have any questions, weíll answer them all. Thatís not regulation, Your Honor. I know. Thatís just being smart. Thatís provision of information. And let me say that Olympic has, as of last night, I believe, the city of Bellevue City Counciló Bellevue is a large municipality across the lakeó the city of Bellevue City Council has approved a new franchise agreement with Olympic. And an element of that franchise agreement with Olympic is an information-sharing process that allows the city of Bellevue to monitor directly Olympicís performance of its obligations to its regulators. So if weíre talking about a mechanism to provide information and a mechanism to receive input, those things arenít regulation. Those are good communication, and those are things that can be negotiated and, in fact, have been negotiated with other municipalities. Seattle doesnít want to talk to us until they know how this case is going to turn out. Mr. Tolleson, is there anythingó tell me what is in the record in terms of facts in the record or expert opinion, anything that relates to the ability of the pipeline to deliver its service. Is there anything in the record relating to the ability of the pipeline to deliver its service if it is subjected to multiple municipal regulations? I honestlyóI know that there isnít any expert opinion, Your Honor. I think that there may have been some probably hearsay comments in the context of depositions that may have found their way into the records. There is no quantification of that. The Court has nothing further. Thank you, Your Honor. Mr. Patton, I have the same question for you. What is there in the record about the ability of the pipeline to deliver its service if it is subjected to multiple municipal regulations? There is nothing specific in the record that answers your question, Your Honor. There was a discussion in our deposition between the preliminary injunction and the summary judgment hearing. We deposedówe, the city, deposed a number of Olympic witnesses. And their two experts, Mr. Hayashida and Mr. Wicklund, testified about what is involved in a hydrostatic pressure test. Through those tests, there is a short time of interruption of the ability to have oil pipeline products flow through the pipeline while the water is flowing through and itís being pressure tested. But thatís a matter of less than a week. I was thinking more about, you know, if you had 30 cities and each of them imposed different standards on the pipeline, whether the economics would make the pipeline not viable any longer. There is no testimony about that, Your Honor. And itís curious to Seattle that Olympic makes that argument because Olympic voluntarily, after the Bellingham explosion in 1999, entered into an agreement with the city of Bellingham that has extensive oversight provisions for the city of Bellingham to the extent that they have to inform the city of Bellingham and have their permission to turn on various valves of the pipeline. And thatís the interstate portion of the pipeline. As Mr. Tollefson just, in talking to you, admitted for the first time in this case, really, that the Seattle lateral is an intrastate pipeline because he was talking about the federal regulations involving intrastate pipelines, even though theyíve always argued that itís an interstate pipeline. But in any case, if the Olympic had concern about different regulations by different municipalities, it should never have entered into the agreement with Seattle in 1992. It should never have entered into the agreement with Bellingham in 2000. Does the record tell us whether there have been agreements with any cities other thanó agreements of this nature with any cities other than Bellingham and Seattle? No, Your Honor. And thatís why weíve said, in response to the Association of Oil Pipelines that filed an amicus brief here, this is not a domino effect in the United States. Itís notóthis is Olympic having decided for its own reasons to agree voluntarily with the city of Seattle and with the city of Bellingham to various provisions that give both those cities contractual rights over the pipeline and supervisory rights over the pipeline. Olympic didóif their argument is correct, in 1992, and certainly in 2000, Olympic didnít have to enter into those agreements and give the city of Bellingham or the city of Seattle any of those contractual rights. Thatís what the United States Supreme Court said in the Golden State Transit case. That is, that you cannot insist on contractual rights in order to overcome a federal standard and provide a municipality with rights that they couldnít otherwise get. But the Supreme Court said, at the same time, you donít have to issue a franchise either. And this Court in the Leonard v. Clark case said, if the union didnít have to agree to those provisions and give up its constitutional rights, but it did. And the evidence here is that in both the two cities with which Olympic has agreed, on these oversight contractual provisions, that it did so voluntarily. It didnít object in 1992. In fact, Mr. Mulkey testified that he helped write the indemnity agreement that Judge Draper asked about. And in Bellingham, it was very clear, both in terms of just looking at the agreement and at Olympicís testimony at the trial, both in the preliminary injunction proceeding and in the summary judgment proceeding, that it voluntarily agreed to those provisions in Bellingham. But now it takes the position that with both the two cities that itís entered into agreements with, that it can promise anything, but hypocritically later say, it doesnít matter because weíre protected from our own agreements by the federal government. That is not a public policy that this Court should endorse, to allow a company to sign anything for political purposes and then later, when the consequences are there, say, Iím sorry, the federal government doesnít let us do this. The federal government has only minimal minimum standards, not specific standards that can only be administered. Are the regulations requirements that Seattle would like to impose that are over and above the minimum standards, are they the same, nearly the same as whatís happening in Bellingham? In the specific request that Seattle made under the indemnity agreement and the franchise agreement, to do a hydrostatic test, that is exactly the test that Olympic did perform in three different cities in Washington after the pipeline explosion in Bellingham. They agreed, as part of the franchise provision in the city of Bellingham, to do just that kind of hydrostatic test. And they agreed to do it, and they did it also in Woodinville and in Renton. And again, in each of those tests, the pipeline burst in one or more places. That is what Seattle asked before Seattle entered into further discussions with Olympic about whether the city would either continue the existing franchise agreement, which it has the right to do for 20 more years, or to consider entering into a different kind of franchise agreement. So what Seattle asked is exactly what Olympic did in Bellingham, Woodinville, and Renton. Thank you. Thanks. Thank you very much. We appreciate the arguments on both sides.
judges: Pregerson, Graber, Gould